Argued and submitted December 19, 1980,
affirmed as modified May 26,
reconsideration denied July 1,
petition for review denied July 21, 1981 (291 Or 368)

SEAL,
*Respondent - Cross-Appellant,*

. *v.*

POLEHN et al,
*Appellants - Cross-Respondents.*

(No. 77-5-266, CA 16932)

628 P2d 746

Mark McCulloch, Portland, argued the cause for appellants - cross-respondents. With him on the briefs was Powers & McCulloch, Portland.

John C. Anicker, Jr., Oregon City, argued the cause and filed the brief for respondent - cross-appellant.

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges.

BUTTLER, J.

## BUTTLER, J.

Plaintiff brought this suit for specific performance of an earnest money agreement after both sellers had died[1] and defendants, as co-personal representatives of the estate of their mother, the last of the two sellers to die, refused to perform that agreement. Defendants appeal from a decree in favor of plaintiff (buyer), contending that the trial court erred in failing to find in defendants' favor on one or all of their affirmative defenses: illegality, breach of fiduciary relationship, unclean hands, misrepresentation and mutual mistake. Plaintiff cross-appeals, contending that the trial court erred in not including in its award of attorney fees to plaintiff such fees incurred in connection with a pretrial appeal to the Supreme Court,[2] and in requiring plaintiff to pay real property taxes as of the date his complaint was filed, rather than as of the date of the decree. We modify the decree and, as so modified, affirm.

The sellers were Richard Polehn, to whom we will refer either by that name or as Mr. Polehn, and Gladys Polehn, his wife, to whom we will refer as Mrs. Polehn; collectively, we will refer to them as the Polehns. Defendants Donald Polehn and Lois Vancil are children of the Polehns and will be referred to collectively as the defendants and individually by their full names.

No useful purpose would be served by detailing the record made by defendants in support of all of their affirmative defenses. The principal defenses are premised on plaintiff's breach of a fiduciary duty to sellers and illegality of the agreement. We are satisfied that there was a fiduciary relationship between plaintiff and Richard Polehn, as a result of which plaintiff has the burden of proof to establish that he did not take unfair advantage of the sellers. *MacDonald v. Dormaier,* 272 Or 122, 535 P2d 527 (1975). We are also satisfied that plaintiff has met that burden and that there was no breach by plaintiff of any duty he owed as a result of that relationship.

---

[1] Less than three months after the agreement was signed, Richard Polehn died; Gladys Polehn died in August, 1979. Thereafter, defendants were appointed personal representatives of Gladys' estate and refused to perform the earnest money agreement.

[2] *Seal v. Polehn,* 284 Or 259, 586 P2d 345 (1978).

The parties had been closely associated in subdividing and selling farm land owned by the Polehns for about ten years prior to the transaction involved here. Plaintiff was a real estate broker and also an independent fee appraiser. He had worked with the Polehns in preparing the subject property for subdivision, although responsibility for proper filing of the final plat with the state rested with the Polehns' attorneys.

Prior to the execution of the disputed earnest money agreement, Richard Polehn, then about 78, suffered a heart attack which necessitated his hospitalization. While hospitalized, he asked his attorney to come in to talk with him. During the ensuing conversation, Mr. Polehn told his attorney that he felt he owed plaintiff something for all of the help plaintiff had given him in subdividing and selling off his farm land and that he wanted to do something for him.

The plaintiff testified that he had talked with Mr. Polehn a number of times about purchasing the remaining subdivision lots which plaintiff had not been successful in selling to others. In February, 1976, Mr. Polehn told plaintiff to prepare an earnest money agreement and submit it to Mr. Polehn at his residence. Plaintiff did so; the earnest money agreement provided for a purchase price of $194,000, with a down payment of $20,000, which would not, in fact, be paid, on the theory that plaintiff's prior services would constitute the $20,000 down payment. That agreement was left with Mr. Polehn, and either he, his wife or daughter called Mr. Polehn's attorney requesting that he come out to the house with one of his associates to talk about some tax matters, Mr. Polehn's estate and the proposed sale of the property to plaintiff.

Both of the defendants were present at that meeting; plaintiff was not. According to Mr. Polehn's attorney, when the subject of the proposed earnest money agreement was discussed, one or both of defendants objected to the price as being too low. Defendant Donald Polehn has been a real property appraiser and broker since 1973. In response to the objection to the price, Richard Polehn stated that he knew the property was worth more than that, but he felt that he owed plaintiff a substantial amount of money and

he wanted to do something for him. The Polehns' attorney testified that after he returned to his office from that meeting, he received a call from Mr. Polehn stating that the family had talked the matter over and requesting the attorney to call plaintiff to tell him to prepare another earnest money agreement with a selling price of $174,000. The attorney relayed that message to plaintiff.

Plaintiff prepared a second earnest money agreement dated February 10, 1976, and presented it to the Polehns, who signed it. Under the terms of that agreement, which the testimony indicates are the same, except for the stated price, as those provided in the first earnest money agreement submitted to Mr. Polehn, plaintiff is required to pay interest only on the unpaid principal balance annually at the rate of 8 percent per annum. Sellers agree to release each lot upon payment of the sum of $5,000, and the full contract balance is required to be paid within ten years. The agreement further provides that deeds to each of the lots be held in escrow by Mr. Polehn's attorney, with a letter of instructions, and that the real property taxes be paid by plaintiff.

Notwithstanding the less than favorable terms of the agreement from the sellers' standpoint, we are satisfied from the foregoing summary of the essential facts relating to the transaction, which is based primarily on the credible testimony of the Polehns' attorney during the relevant time, that plaintiff did not abuse his fiduciary relationship with the Polehns in connection with this transaction. There is evidence that Mr. Polehn was not in very good health. However, the agreement was entered into only after independent consultation by the Polehns with their attorneys and members of the family. Although there is evidence that the property was worth substantially more than the contract price, Mr. Polehn was aware of that fact but wanted to do something for plaintiff. We are also satisifed, without detailing the evidence further, that there was no misrepresentation on the part of plaintiff, no unclean hands or mutual mistake.[3]

---

[3] The claimed misrepresentation relates to the price; defendants contend that if the reasonableness of the price was not misrepresented by plaintiff, there was a mutual mistake as to the fairness of the price. The unclean-hands defense is

■ The remaining issue on defendants' appeal is that of illegality of the agreement, based upon the fact that the subdivision property had not been registered as required by law. ORS 92.305 *et seq.* The earnest money agreement included 37 lots which were not registered with the county at the time of the execution of the earnest money agreement, and 14 of them were not registered with the State of Oregon. ORS 92.325(1) provides that "* * * no person shall sell or lease any subdivided lands without having complied with all the applicable provisions of ORS 92.305 to 92.495." The statute, however, does not expressly declare that any agreement made in contravention of it is void. Rather, the statutory scheme provides other sanctions, both civil and criminal: a civil penalty up to $1,000 may be imposed by the Real Estate Commissioner, ORS 92.490, or the Commissioner may obtain a cease and desist order enjoining, among other things, the further sale of lots within the subdivision. ORS 92.495. Further, a violation of ORS 92.325(1) is punishable by a fine of up to $10,000 or imprisonment for up to three years, or by both. ORS 92.990(2).

Given this statutory scheme, the following statement of the court in *Uhlmann v. Kin Daw,* 97 Or 681, 690, 193 P 435 (1920), is appropriate:

"* * * Of course, if a statute expressly declares that an agreement made in contravention of it is void, then the inquiry is at an end; but, in the absence of such a declaration, the court may take the statute by its four corners and carefully consider the terms of the statute, its object, the evil it was enacted to remedy, and the effect of holding agreements in violation of it void, for the purpose of ascertaining whether it was the legislative intent to make such agreements void; and if from all these considerations it is manifest that the lawmakers had no such intention, the agreements should be held to be legal contracts and enforceable as such: [citations omitted] * * *."

The purpose of the Oregon Subdivision Control Law appears in ORS 92.313(1):

---

closely related to the one based on a breach of a fiduciary relationship, discussed in the body of the opinion; it relies on some additional evidence which we find unpersuasive, and does not require separate discussion.

"(1) The Legislative Assembly finds that the development of new subdivisions and the promotion of sales and leases of such property are now largely uncontrolled and unregulated in this state and that a need exists to protect the public from fraud, deceit and misrepresentation."

It appears that the legislative purpose of protecting the consuming public (*see* ORS 92.317) is to be enforced under the legislative scheme by compelling compliance, enjoining violations, civil and criminal penalties, and by the legislative directive (ORS 92.317) to the Attorney General to protect the rights of consumers "to the greatest extent practicable through the application of the provisions of ORS 646.605 to 646.652" (Unlawful Trade Practices Act). That purpose is not intended to be served by declaring all sales made in violation of the Act absolutely void — a result which might damage a purchaser more than it would protect him. It may well be that a purchaser could have a sale made in violation of the Act declared void — that is, the transaction may be voidable, not void. However, we see no reason whatsoever to void the transaction at the behest of the seller, who clearly is not within the protected class. We conclude that the agreement is not void.

■ On cross-appeal, plaintiff contends first that the trial court should have awarded him attorney fees incurred in an appeal to the Supreme Court preliminary to trial on the merits. The parties stipulated that the trial court could fix attorney fees, if an award of attorney fees was appropriate, without the necessity of expert testimony. The plaintiff submitted a letter to the court showing a breakdown of time devoted to the matter in the trial court and in the Supreme Court. There is no contention that either the hours spent on the matter or the hourly rate were unreasonable. The letter indicated that a reasonable fee for hours spent in the trial court was $2,210, and that a reasonable fee for the appeal to the Supreme Court was $1,135. The trial court awarded $2,210 to plaintiff for attorney fees, and, although the trial court did not state its reason for that award, it appears clear that the trial court eliminated any fees for plaintiff's earlier appeal based on defendants' contention that plaintiff should have requested those fees from the Supreme Court.

The earnest money agreement provided:

"* * * In any suit or action brought on this contract, the losing party therein agrees to pay the prevailing party therein (1) the prevailing party's reasonable attorney's fees in such suit or action, to be fixed by the trial court, and (2) on appeal if any, similar fees in the appellate court, to be fixed by the appellate court."

The question is whether plaintiff should have applied to the Supreme Court for an award of attorney fees after he prevailed in overruling defendants' demurrer in that court and the case was remanded for trial. Defendants contend that plaintiff should have done so and, having failed to do so, is not now entitled to have an award of attorney fees, which includes the prior appeal, fixed by the trial court.

We construe subparagraph (1) of the contract provision to mean that the losing party agrees to pay the "prevailing party" the latter's reasonable attorney fees in any suit or action, after final judgment on the merits, to be fixed by the trial court. After final judgment on the merits has been rendered, the trial court may fix the amount of attorney fees for the entire litigation, including those incurred in connection with a prior appeal if the contract, as here, authorizes attorney fees on an appeal. The language in subparagraph (2) of the contract provision, "to be fixed by the appellate court," means that where the appellate court makes a final determination, without remand for a trial or new trial, then that court fixes the fees on appeal.

The upshot of that construction of the contract provision is that the "prevailing party" is not determined until a final judgment on the merits of the litigation has been rendered, after which, but not before, the party in whose favor the judgment is rendered is entitled to an award of reasonable attorney fees.[4]

---

[4] Our construction of the contract provision appears to be consistent with ORS 20.096, although the statute does not come into play where the contract provides for the award of an attorney fee to the prevailing party, but is applicable only when the contract provides that one of the parties is entitled to attorney fees if he prevails. Under ORS 20.096(5), the "prevailing party" means the party in whose favor *final* judgment, order or decree is rendered. That definition of prevailing party makes sense and ought to be applied to the contract provision here in order to make the provisions of the statute and the contract provision harmonious and co-extensive. *See Jewell v. Triple B. Enterprises, Inc., 290 Or 885, 626 P2d 1383 (1981).*

It is possible, for example, for plaintiff to have prevailed in the Supreme Court in the prior appeal, but to have lost in the trial court on remand. In such a case he would not be entitled to any attorney fees under our construction of the provision. Similarly, if we were to reverse the judgment in this case, plaintiff would be entitled to no attorney fees, but defendants would be entitled to them in the trial court and in this court. Whether under those circumstances defendants would be entitled to attorney fees in the Supreme Court, where they lost, we need not decide. Because plaintiff prevailed in both the trial court and Supreme Court, he is now entitled to attorney fees incurred with respect to the entire litigation where, as here, the contract provision provides for attorney fees in the appellate court.

In view of the fact that the defendants do not dispute the reasonableness of the amounts claimed, or that the trial court, in awarding attorney fees, eliminated exactly that portion of attorney fees claimed which related solely to the Supreme Court appeal, we see no reason to remand. We modify the decree to provide for an award of $3,345 on account of attorney fees, instead of the $2,210 awarded by the trial court, for services as of the time of the decree.

■   Plaintiff's second contention on cross-appeal is that if the earnest money agreement is enforced according to its terms, real property taxes should be prorated at closing or as of the date of possession. The earnest money agreement provides:

> "Seller and purchaser agree to pro rate the taxes which are due and payable for the current tax year. * * * Adjustments are to be made as of the date of the consummation of said sale or delivery of possession, whichever first occurs. * * *"

Obviously, the sale has not yet been consummated, there has been no closing, and plaintiff has not obtained possession. Under the terms of the earnest money agreement, if plaintiff did not go through with the purchase after the sellers had approved it and provided evidence of marketable title, the plaintiff's only obligation was to forfeit the $1,000 down payment.[5] Accordingly, the trial court

---

[5] Actually, plaintiff would have been entitled to the "forfeited" $1,000 as a commission under the terms of the agreement.

appears to have concluded that it was not until plaintiff filed this proceeding in May, 1977, that plaintiff could be held to the contract.[6] We concur in that reasoning and with that result. That portion of the decree is affirmed.

Affirmed as modified.

---

[6] The earnest money agreement was recorded by plaintiff on July 6, 1976. A reasonable argument might be made that as of that date plaintiff effectively tied up the real property and therefore should be obligated to assume the tax burden from the date of recording. No such contention is made here, and we do not pass on it.